In re Stanley E. PEREA and Glenda R. Perea, Debtors.

UNITED STATES of America, Plaintiff,

v.

Stanley E. PEREA and Glenda R. Perea, Defendants.

Bankruptcy No. 87–B–01255 E.
Adv. No. 87 J 0546.

United States Bankruptcy Court,
D. Colorado.

July 18, 1988.

Dahil M. Goss, Asst. U.S. Atty., for plaintiff.

Jeffrey Anderson, Johnson & Anderson, Littleton, Colo., for debtors/defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAROLD L. MAI, Bankruptcy Judge.

THIS MATTER having come on for trial on a Complaint to Determine Discharge:

Dahil M. Goss, Assistant United States Attorney, appearing for plaintiff; Jeffrey Anderson of Johnson and Anderson, Littleton, Colorado, appearing for debtors/defendants.

The court having considered the parties' stipulation as to certain facts, the testimony and exhibits received at trial, the closing arguments submitted by briefs, and having heard argument of counsel and being fully advised, does hereby find and conclude as follows:

## FINDINGS OF FACT

1. Plaintiff in this case is the Small Business Administration (SBA), an agency of the United States of America, which guarantees small business loans obtained through commercial lending institutions.

2. The First National Bank of Alamosa (the Bank) is a commercial lending institution in Alamosa, Colorado.

3. Defendants in this case, Stanley E. Perea (Mr. Perea) and Glenda R. Perea (Mrs. Perea), acting as President and Secretary of Perea and Associates, P.C., applied for and obtained an SBA guaranteed loan in the amount of $380,000 from the Bank.

4. Mr. Perea, has been a Certified Public Accountant since 1978–79. He worked for Peat, Marwick, Mitchell and Co., as an auditor for one (1) year. He also worked as a comptroller for the Banco International in Tucson, Arizona, for approximately a year and a half.

5. Mr. Perea was self-employed as a Certified Public Accountant from 1975 to 1979. During this time he was involved in management services including loan packaging for banks, SBA, Economic Development Agency (EDA), acquisition audits, and consulting on sales, mergers, and liquidation.

6. Mr. Perea was a member of the SBA Region 8 Denver Advisory Council prior to his application for an SBA guaranteed loan. Mr. Perea is a knowledgeable, sophisticated, and experienced person in commercial credit transactions.

7. In 1981, Mr. Perea formed the accounting firm of Perea and Associates, a Professional Corporation, in Denver, Colorado.

8. Robert Litzau (Litzau), Kenneth Heuer (Heuer), Ervina Mattson (Mattson), and Myrna Schmidt (Schmidt) were all certified public accountants who joined Perea and Associates, P.C., as shareholders, at different times.

9. As of January 24, 1985, the shareholders of Perea and Associates, P.C., were:

| | |
|---|---|
| Stanley E. Perea | 29% |
| Kenneth Heuer | 25½% |
| Robert Litzau | 25½% |
| Ervina Mattson | 10% |
| Myrna Schmidt | 10% |

10. Thomas LeVasseur (LeVasseur), an accountant, invested in the firm but could not become a shareholder because he was not a certified public accountant. He worked for Perea and Associates, P.C., as the Office Administrator in charge of the computerized billing system. He had no authority to make changes or adjustments to the financial statements without the approval and authorization from the president of the firm.

11. Mr. Perea was the President and Chairman of the Board of Perea and Associates, P.C., from its inception. As President and Manager of Perea and Associates, P.C., Mr. Perea organized, planned, and managed the firm. Mr. Perea was familiar with the books and records of the firm and the manner in which they were maintained. Mr. Perea participated in the meeting of the Board of Directors of Perea and Associates, P.C. (Denver), from its inception.

12. In early 1984, Mr. Perea moved to Alamosa, Colorado, and opened an accounting office. The office in Alamosa was not part of Perea and Associates, P.C. (Denver). Litzau became the President of Perea and Associates, P.C. (Denver), when Mr. Perea moved to Alamosa, Colorado. Mr. Perea, nevertheless, remained a shareholder and Chairman of the Board of Directors of Perea and Associates, P.C. (Denver).

13. Mr. Perea remained involved in the management of Perea and Associates, P.C. (Denver), even while residing in Alamosa and during the first six (6) months of 1985.

Mr. Perea was involved in the collection of accounts receivable, client development, client relations, and in the supervision of Litzau. During March, April, and May of 1985, Mr. Perea met with the other shareholders on a monthly basis to go over the financial statements and the accounts receivable of Perea and Associates, P.C.

14. Ms. Mattson became a shareholder in Perea and Associates, P.C., in May, 1984. She had been a certified public accountant since 1974. She specialized in auditing work and performed all of the audit work for the firm. Ms. Mattson became the President of Perea and Associates, P.C., after Litzau's resignation in May, 1985.

15. Perea and Associates, P.C. Denver, experienced losses since its inception. In the summer of 1985, Perea and Associates, P.C., had problems with collecting on their receivables and could not pay their payables. Mattson, Heuer, Schmidt, and LeVasseur applied for an SBA loan in the amount of $325,000. With this money they planned to pay off a debt to the United Bank of Lakewood in the amount of $250,000 and have $75,000 in working capital.

16. Ms. Mattson was asked by the other shareholders to prepare some projections on what the funds from the SBA loan would do for the firm. The result of these projections was that the business would be bankrupt in six (6) months even with the SBA loan that would provide the business with a $75,000 injection of working capital.

17. The shareholders then asked Mattson to analyze the financial statement of Perea and Associates, P.C., to determine why the business was showing a net worth when the projections predicted imminent bankruptcy. Accordingly, Ms. Mattson analyzed the financial statement generated by Perea and Associates, P.C. (Denver), as of July 31, 1985. She reviewed the accounts receivable, notes receivable, work in progress, retained earnings, and the capital account.

18. Ms. Mattson consulted with the tax manager, the other shareholders, and LeVasseur and determined that the $64,971.97 shown on the financial statement of Perea and Associates, P.C., as of July 31,

1985, as work in progress was overstated. She determined that only approximately $16,000 of the work in progress shown could be substantiated by firm records. Consequently, she proposed writing off approximately $48,000 of the work in progress.

19. Upon review and analysis of the accounts receivable (collection and trade) as shown in the financial statement of Perea and Associates, P.C. (Denver), as of July 31, 1985, she recommended that the financial statement be adjusted as follows:

a. a reduction of $52,575.42 to accounts receivable (trade),

b. a reduction of $23,283 to accounts receivable (collection),

c. creation of an allowance for uncollectible accounts (collection) of $5,626 (which reduces the accounts receivable by that amount),

d. a reduction of $48,025 to work in progress.

20. The above adjustments reduced the current assets of Perea and Associates, P.C. (Denver), as of July 31, 1985, from $267,943 to $138,333.95.

21. Mattson reviewed the capital account of Perea and Associates, P.C., from the date of inception to July 31, 1985. Based on her investigation, she found that the capital account was incorrect. It showed as contribution to capital, monies which were loaned to the business, *to wit,*

a. loan from HLS Leasing (Heuer, Litzau and Schmidt), to Perea and Associates, P.C., in the amount of $35,500 made in September, 1984;

b. loan from Tom LeVasseur to Perea and Associates, P.C., in the amount of $35,000.

22. Mattson prepared adjusting entries to the financial statement of Perea and Associates, P.C. (Denver), as of July 31, 1985. In addition, she prepared an *adjusted* balance sheet which contained her adjustments. The net effect of the adjustments was a decrease in asset in the amount of $167,109, increase in retained earnings in liabilities in the amount of $61,634.60, decrease in common stock in the

amount of $97,000, and an increase in deficit in retained earnings in the amount of $131,484.34.

23. As a result of these adjustments, Perea and Associates, P.C., had a negative equity of $251,134.15 as of July 31, 1985. As a result of the internal audit, Mattson, Heuer, Schmidt, and LeVasseur decided that, not only did they not want to have any part of the SBA loan, but that they should file bankruptcy for the firm.

24. On August 15 and 16, 1985, Mr. Perea attended meetings of the Board of Directors of Perea and Associates, P.C. (Denver). At these meetings, copies of the adjusted entries and the adjusted balance sheets prepared by Ms. Mattson were distributed to all participants, including Mr. Perea. These adjustments were then extensively discussed by the participants.

25. During these discussions of the adjustments at the meetings of the Board of Directors, Mr. Perea verbally agreed with the adjustments proposed by Mattson regarding accounts receivable and work in progress. During the meetings Schmidt marked on her copy the adjusting entries to which Mr. Perea verbally agreed during the discussion of Mattson's analysis of the firm's financial condition.

26. Based on the desperate financial condition of Perea and Associates, P.C., Mattson, Heuer, Schmidt, and LeVasseur wanted to file bankruptcy. Mr. Perea disagreed with the proposed action and made a counterproposal. Mr. Perea proposed that Schmidt, Heuer, Mattson, Litzau, and LeVasseur walk out of their investment and agree not to sue him for anything. In exchange, Mr. Perea would try to get an SBA guaranteed loan with his personal guaranty. With the proposed loan he would pay the United Bank of Lakewood, resulting in a release of the other shareholders' liability to the Bank. This proposal was accepted by the other shareholders.

27. Buy-back agreements between Mr. Perea, Heuer, Schmidt, Litzau, Mattson, and LeVasseur were executed on September 12, 1985. These buy-back agreements, signed by all parties including Mr. Perea, stated, in part, as follows: (a) that Perea and Associates, P.C. (Denver), was experiencing severe financial difficulties as of September 12, 1985; (b) that all shareholders considered that it may be necessary to file for protection or liquidation of the firm in the bankruptcy courts; (c) that all shareholders have had access to the corporate books and records and were familiar with the current financial condition of the corporation; and (d) that Mr. Perea would be responsible for obtaining an SBA guaranteed loan and that, if the loan was not approved, the corporation would be liquidated.

28. As a result of the buy-back agreements, Mr. Perea became 100 percent shareholder of Perea and Associates, P.C.

29. Ms. Mattson remained employed, at the same salary, as an auditor for Perea and Associates, P.C., for approximately one (1) year after she executed her buy-back agreement. Mr. LeVasseur also remained employed by Perea and Associates, P.C., for approximately six (6) months after he executed his buy-back agreement.

30. On September 16, 1985, four (4) days after the buy-back agreements were executed, Mr. and Mrs. Perea, as officers of Perea and Associates, P.C., submitted a loan application for an SBA guaranteed loan in the amount of $380,000 to the First National Bank of Alamosa.

31. For purposes of applying for the loan, Mr. Perea merged his accounting office in Alamosa with Perea and Associates, P.C. (Denver). Mr. Perea chose to combine the financial statement of July 31, 1985 of Perea and Associates, P.C. (Denver), as it existed *prior* to the adjustments proposed by Mattson, and the financial statement of the Alamosa office, and presented it to the Bank as if a merger had occurred.

32. On or about September 16, 1985, Mr. Perea submitted a loan application to the Bank and the SBA. This application was supported by false documents relating to his personal financial condition as well as the financial condition of Perea and Associates, P.C.

33. The personal financial statement submitted with the loan documentation was false in the following respects:

   a. it shows a note receivable of $2,970 from Perea and LeVasseur, Inc., which did not exist;

   b. it shows the value of the stock in Perea and LeVasseur, Inc., a leasing firm owned 50–50 by Mr. Perea and Tom LeVasseur, as $5,000 when, in reality, the corporation had liquidated in early 1985 and the only asset remaining was a tax refund of $980.22;

   c. it shows the value of the stock in Perea and Associates, P.C., as $450,000 based, in part, on two (2) previous sales of 10 percent (10%) each at $45,000 when, in reality, the two (2) previous sales involved 15½% of the stock and were made to Litzau and Heuer for $20,000 each.

34. Mr. Perea knew the personal financial statement was false as described above. He submitted it to the Bank with the intention of deceiving it into making the loan.

35. Mr. Perea knowingly and intentionally submitted to the Bank and SBA a false account payable aging report which showed an erroneous aging of the accounts payable of Perea and Associates, P.C., to induce the Bank and SBA into believing that the business was current in making payments to their creditors. For example, Mr. Perea admitted that he knew that the debt of Perea and Associates, P.C., to TLS Company for $11,520 was for services provided by that company more than 90 days prior to July 31, 1985, yet he submitted the report showing that the debt was incurred within 30 days.

36. The account receivable aging report of Perea and Associates, P.C. (Denver), as of July 31, 1985, is false because it shows accounts receivable that Mr. Perea knew were uncollectible and contains an erroneous aging on some of the accounts.

37. Perea and Associates, P.C. (Denver), generated aged accounts receivable reports from its computerized time and billing system for each month. These reports were not provided to the Bank with the loan application or thereafter. Instead of using the reports generated by the business' computer system, Mr. Perea personally prepared an accounts receivable aging report and altered the aging of some of the accounts receivable.

38. For example, Unique Equipment owed Perea and Associates, P.C., $2,130.20 since February, 1984. Yet, Mr. Perea showed the account receivable from Unique Equipment in his report as being current instead of overdue for more than 90 days. Vera Shader, officer of Unique Equipment, testified that Mr. Perea did not have any discussions with her regarding her account, and that she did not have any intention of paying her debt to Perea and Associates, P.C.

39. In another instance, Mr. Perea substituted Touch Ross and Co., for his own name in the account receivable for $6,802, which represented money owed by himself to Perea and Associates, P.C. Ms. Mattson testified that she performed audit work for Perea's business in Alamosa and that the $6,802 was money owed by Mr. Perea to Perea and Associates, P.C., and not by Touch Ross and Co. Touch Ross and Co. did owe Perea and Associates, P.C., $2,150, which was reflected under the account of City and County of Denver.

40. The analysis of the financial statement of Perea and Associates, P.C., as of July 31, 1985, prepared by Mr. Perea, is false in that it is an analysis of false financial statements, it provides false and overstated values for the office furniture and equipment and the accounts receivable pledged as collateral for the loan, and fails to disclose relevant and revealing information regarding the true financial condition of Perea and Associates, P.C.

41. The pro-forma combined financial statement of Perea and Associates, P.C., as of November 30, 1985, is false in that it incorporates the false financial statement of Perea and Associates, P.C. (Denver), as of that date.

42. The financial statement of Perea and Associates, P.C. (Denver), as of No-

vember 30, 1985, is false in several respects:

a. the November 30, 1985, financial statement continues to show the overstated accounts receivable and the unsubstantiated work in progress from the previous financial statements. Mr. Perea did not adjust these figures from the previous financial statement, even though he knew them to be incorrect;

b. the income statement as of November 30, 1985, shows a net profit of $78,148.46, when, in fact, Mr. Perea knew the firm was experiencing a loss for 1985.

43. The original financial statement of Perea and Associates, P.C., as of July 31, 1985, prior to the adjustments proposed by Mattson, shows assets of $411,371.97, liabilities of $433,763.04, common stock of $152,796.53, and a deficit in retained earnings of $188,520.26. This financial statement was not provided to the Bank or SBA with the loan application, or thereafter. However, it was used by Mr. Perea in the preparation of the *combined* financial statement of Perea and Associates, P.C., submitted to the Bank and SBA in support of the loan application.

44. The combined financial statement of Perea and Associates, P.C., as of July 31, 1985, is false because it incorporates the erroneous financial statement of Perea and Associates, P.C., as of that date as discussed above. Mr. Perea chose not to incorporate the financial information presented at the meetings of the Board of Directors when he submitted the financial information to the Bank and SBA. Mr. Perea knowingly and intentionally chose to use the former financial statement of the business without incorporating the unfavorable information, thereby misrepresenting to the Bank and SBA the true financial condition of the business, *i.e.*, that Perea and Associates, P.C., was insolvent.

45. Prior to 1985, Mr. LeVasseur and Mr. Perea were the owners and officers of a corporation known as Perea and LeVasseur, Inc., which was in the business of leasing. Mr. Perea submitted a copy of the federal corporate income tax return for Perea and LeVasseur, Inc., for 1984 as part of his loan application. The tax return supplied by Mr. Perea was not the one the corporation filed with the Internal Revenue Service on or about September 15, 1985.

46. LeVasseur had given Mr. Perea a copy of the final corporate income tax return of Perea and LeVasseur, Inc., for 1984 filed with the IRS. In addition, Mr. Perea knew that Perea and LeVasseur, Inc., had liquidated in early 1985 and it had no significant assets at the time of the loan application.

47. The schedule of equity changes of Perea and Associates, P.C., as of July 31, 1985, is false in several respects:

a. it shows that the proceeds from the sale of stock of Perea and Associates, P.C., to Litzau, Heuer and Schmidt in March, 1984, all went to the corporation when, in reality, only $500 of the $20,000 paid by Litzau and Heuer went to the corporation, and only $1,000 of the $20,000 paid by Schmidt went to the corporation. The balance of these proceeds was kept by Mr. Perea personally.

b. it classifies moneys loaned to the firm as capital when it should have been properly classified as notes payable, for example,

(1) loan from HLS Leasing (Heuer, Schmidt and Litzau) in the amount of $34,500 in September, 1984; and

(2) loan from Tom LeVasseur in the amount of $25,000.

48. Mr. Perea knew the schedule of equity changes was false when he submitted it to the Bank as part of his loan application.

49. Mr. Perea pledged, as collateral for the SBA guaranteed loan, office furniture and equipment valued at $95,000 which was leased rather than owned by Perea and Associates, P.C., or by Mr. Perea.

50. The office furniture and equipment pledged as collateral was described in the Summary of Collateral attached to the loan application. This Summary was submitted

by Mr. Perea as part of the loan application.

51. The lists describing the office furniture and equipment attached to the Summary of Collateral are the same lists that are attached to the lease agreements. However, Mr. Perea did not provide copies of the subject lease agreements to the Bank and SBA with the loan application or at any time thereafter. The Bank or SBA could have discovered that the collateral was leased had they been provided copies of said leases.

52. At the time of the loan application, Perea and Associates, P.C., was not current on its lease payments for the office furniture and equipment leased from HLS Leasing, Tom LeVasseur and David Tice, and, as a result, under the terms of the lease agreements the office furniture and equipment were subject to repossession.

53. Not including the leased equipment and furniture, the fair market value of the office furniture and equipment actually pledged as collateral did not exceed $10,000.

54. Mr. Perea knew that SBA and the Bank were relying on the stated value, existence and lien priority of the office furniture and equipment, and accounts receivable pledged as collateral for the loan as a condition for approval of the loan.

55. Mr. Perea signed a Security Agreement stating that Perea and Associates, P.C., owned all of the office furniture and equipment described in the attachments to the Security Agreement when, in fact, he knew that most of the office furniture and equipment pledged as collateral to the loan was leased from third parties rather than owned by Perea and Associates, P.C., or by himself personally.

56. Mrs. Perea also signed the Security Agreement. At the time she signed the Security Agreement, she knew that some of the equipment and furniture was leased and not owned.

57. The pro-forma merger of the Alamosa office with the Denver office could not have, and did not, improve the poor financial condition of Perea and Associates, P.C. (Denver). The Alamosa office was a small office with gross revenued of $135,000 during 1985 and a net income of $17,000 during 1985.

58. Mr. Perea knowingly and intentionally disregarded and concealed information showing the true financial condition of Perea and Associates, P.C. (Denver), at the time he applied for the SBA guaranteed loan with the Bank and thereafter, in order to induce the Bank and SBA to approve the loan for $380,000.

59. The Bank granted the loan to Perea and Associates, P.C., shortly after SBA's approval of the request for a guaranty on January 23, 1986. On February 3, 1986, the defendants signed the promissory note, security agreements, deeds of trust, assignment of stock and life insurance policy, agreement to allow SBA to enter into the premises to take collateral in the event of default, and financing statements. Disbursement of the loan proceeds occurred on February 3 and 12, 1986, and on March 1 and 26, 1986.

60. Glenda R. Perea was Secretary of Perea and Associates, P.C., and personal guarantor of the loan. She read the loan application made by Perea and Associates, P.C., and reviewed the attached and supporting documentation.

61. The Bank and SBA followed their own procedures and policies in evaluating and approving the loan which are consistent with the procedures used by the banking industry in the community. The Bank referred the loan to its loan committee and verified Mr. Perea's background and credit. Specifically, the Bank called several major clients of Perea and Associates, P.C., and another Bank, and received no unfavorable information in response to its inquiries.

62. The Bank and SBA relied on the aging reports in determining whether or not to make the loan.

63. The Bank and SBA relied on the income statements of Perea and Associates, P.C., as of July 31, 1985, and November 30, 1985, in determining whether or not to make the loan.

64. The Bank and SBA relied on the balance sheet in the financial statements of Perea and Associates, P.C., as of July 31, 1985, and November 30, 1985, in determining whether to make the loan.

65. The Bank relied on Mr. Perea's personal financial statement as a back-up security for the loan.

66. The Bank and SBA relied on the financial statements, aging reports, and documents regarding the financial condition of Mr. Perea and Perea and Associates, P.C., submitted by Mr. Perea during the loan application process, in evaluating the loan application, extending credit, and disbursing the loan proceeds.

67. The Bank and SBA relied on the representations made by Mr. Perea in the summary of collateral and security agreement which purported to show that the business owned all of the office furniture and equipment pledged as collateral. The Bank and SBA also relied on the representations made by Mr. Perea regarding the value, existence, and collectability of the accounts receivable and work in progress of Perea and Associates, P.C.

68. The Bank and SBA did not know prior to approving and disbursing the loan proceeds that most of the office furniture and equipment described by Mr. Perea, and valued at $95,000, was leased rather than owned by Perea and Associates, P.C., or by Mr. Perea personally.

69. The Bank and SBA did not know prior to approving and disbursing the loan proceeds that a substantial portion of the accounts receivable and work in progress of Perea and Associates, P.C., was unsubstantiated and uncollectible.

70. The Bank and SBA did not have any reason to distrust Mr. Perea's representations to them because Mr. Perea had an ongoing business relationship with the Bank and SBA, had been a member of the SBA Advisory Committee, and was a Certified Public Accountant.

71. The Bank and SBA did not know that Perea and Associates, P.C., was insolvent for several months prior to and during the time the Bank and SBA were in the process of reviewing the loan application.

72. The Bank and SBA would not have recommended approval of the loan had it known that: (a) Perea and Associates, P.C. (Denver), was insolvent at the time of the loan application; (b) that the financial statements of Perea and Associates, P.C., were false; (c) that the value of the collateral was overstated; and (d) that a substantial amount of the accounts receivable and work in progress was uncollectible and unsubstantiated.

73. Perea and Associates, P.C., defaulted on the loan after making two (2) payments of $6,800 each. On October 15, 1986, Perea and Associates, P.C., made an additional payment on the loan in the amount of $16,800.

74. There is a deficiency balance due to the SBA on the Promissory Note and Guaranty in the principal sum of $377,286.58, with interest of $43,013.09 calculated as of December 2, 1987, resulting in a total amount of $420,299.67. Interest continues to accrue at a daily rate of $105.95 from December 3, 1987.

75. By virtue of the SBA guaranty, the defendants are jointly and individually liable on this deficiency.

76. Perea and Associates, P.C., filed a voluntary petition under Chapter 7 of the Bankruptcy Code on November 24, 1986 (Case No. 86–B–1232 M).

77. The defendants filed a voluntary petition under Chapter 7 of the Bankruptcy Code on February 4, 1987 (Case No. 87–B–1255 E).

78. SBA agreed to assume service of the loan made by the First National Bank of Alamosa and the loan was assigned to the Small Business Administration.

79. On July 17, 1987, the United States on behalf of its agency the Small Business Administration filed a timely complaint pursuant to the Bankruptcy Code to determine the dischargeability of defendants' debt to the SBA.

## CONCLUSIONS OF LAW

1. Sections 523(a)(2)(A) and (B) of the Bankruptcy Code, 11 U.S.C., state in part:

(a) A discharge under Section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property services or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial conditioning;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the creditor or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

2. The burden of proof under section 523(a) is on the creditor objecting to the discharge and each element must be proved by clear and convincing evidence. *In re Black,* 787 F.2d 503, 506 (10th Cir. 1986). The creditor must establish that a materially false writing was made knowingly with the intent to deceive. *Id.*

3. SBA agreed to assume service of the loan made by the First National Bank of Alamosa to Perea and Associates, P.C., and the loan was assigned to SBA. SBA is, therefore, a creditor of the defendants.

4. By virtue of the guaranty, the defendants became jointly and individually liable for the debt of Perea and Associates, P.C., to the Bank and SBA.

5. The loan application and the accompanying documents submitted by Mr. Perea to the Bank an SBA were intended to be a representation of Mr. Perea's financial condition as well as the financial condition of Perea and Associates, P.C., a corporation owned entirely by Stanley E. Perea at the time the loan application was made.

6. The financial statements and other written documents submitted by Mr. Perea to the Bank and SBA were the basis for the extension of credit.

7. The Bank and SBA reasonably relied on the written statements and representations made by Mr. Perea regarding his financial condition and the financial condition of Perea and Associates, P.C.

8. The information provided by Mr. Perea in the financial statements and other documents attached to the loan application was materially false within the meaning of § 523(a)(2)(B)(i).

9. Perea and Associates, P.C. (Denver), was insolvent as of July 31, 1985. The merger with the Alamosa office, a small operation, would not have and did not substantially improve the financial condition of the corporation. Financial statements of Perea and Associates, P.C., showing profits and overstated assets when the business was insolvent are materially false within the meaning of 11 U.S.C. § 523(a)(2)(B)(i).

10. The Bank and SBA did rely on this materially false information prepared by, or submitted by, Mr. Perea as part of the loan application.

11. The Bank and SBA's reliance on these materially false representations was reasonable.

12. Intent to deceive is established in this case by, among other facts, Mr. Perea's knowledge that Perea and Associates, P.C., was insolvent and unable to meet its obligations at the time he applied for a loan.

13. The misrepresentations in the financial statement were made with the intent that the Bank and SBA would rely on them.

14. In this case, Mr. Perea knew that Perea and Associates, P.C., was insolvent at the time of the loan application and knew that the financing statement submitted did not represent the true financial condition of the firm.

15. Mr. Perea represented to the Bank and SBA that the office furniture and equipment were owned rather than leased

by the corporation. This misrepresentation was made with the intent to deceive the Bank and the SBA.

16. The Bank and SBA would not have approved the loan had they known the true financial condition of Perea and Associates, P.C.

17. Mr. Perea obtained $380,000 from the Bank and SBA by false representations and by the use of false written statements respecting his financial condition as well as the financial condition of Perea and Associates, P.C. Consequently, his entire debt to SBA and the Bank is nondischargeable pursuant to section 523(a)(2)(B).

18. The evidence did not establish that, by signing the loan application and security agreements, Mrs. Perea intentionally deceived the Bank and the SBA.

19. Unlike the case of Mr. Perea, there is no evidence that Mrs. Perea prepared or submitted materially false documentation. Although she testified that she knew the firm "was having trouble," there is no evidence that she knew or should have known the extent of financial difficulties, namely that it was insolvent. There is no evidence that she discussed any of the proposed collateral with the Bank or that she was actively involved in the procurement of the loan.

20. Although Mrs. Perea testified that she knew that some of the equipment was leased rather than owned, there is no evidence that she knew the leases were in default or that she intended to deceive the Bank and the SBA regarding the ownership of the furniture and equipment.

21. There is no evidence that the Bank and the SBA relied upon representations made by Mrs. Perea in determining whether or not to make the loan.

22. The debt of Mrs. Perea to the SBA in the amount of $377,286.58 is dischargeable in bankruptcy.

23. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

The court will enter a separate Order for each defendant.